IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

FILED - CLERK
U.S. DISTRICT COURT

2000 MAY 30  PM 4: 46

TX EASTERN r LUFKIN

BY



| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. HARROLD E. (GENE) WRIGHT,<br><br>Plaintiffs,<br><br>v.<br><br>MOBIL CORP.; MOBIL OIL CORP.;<br>MOBIL EXPLORATION AND<br>PRODUCING U.S., INC.; MOBIL<br>EXPLORATION AND PRODUCING<br>NORTH AMERICA, INC.; MOBIL<br>PRODUCING TEXAS & NEW MEXICO<br>INC.; MOBIL ROCKY MOUNTAIN,<br>INC.; MOBIL NATURAL GAS, INC.,<br>BURLINGTON RESOURCES, INC.;<br>BURLINGTON RESOURCES OIL & GAS<br>COMPANY; BURLINGTON<br>RESOURCES TRADING, INC.;<br>BURLINGTON RESOURCES<br>GATHERING, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 9:98CV30 |

## COMPLAINT OF THE UNITED STATES OF AMERICA

Plaintiff, The United States of America ("United States" or "Government"), brings this

civil action against the defendants and alleges as follows:

### I. INTRODUCTION

1. This is an action under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"),

Section 112 of the Federal Oil and Gas Royalty Management Act ("FOGRMA"), 30 U.S.C.        §

1722, and common law and equitable theories of unjust enrichment and disgorgement, to recover

damages, penalties and/or disgorgement of additional royalties in connection with the defendants'

underpayment of royalties to the United States and Indian tribes for natural gas and natural gas

liquids (collectively "gas") produced from federal and Indian lands.   These claims are premised

on the defendants' use of false records and statements to misreport or conceal the proper value of

their federal and Indian gas production for royalty purposes.

## II. JURISDICTION AND VENUE

2.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

3.  Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)

and (c), since the defendants reside and/or transact business within this district.

## III. PARTIES

4.  The plaintiff in this action is the United States, suing on its own behalf and on behalf of

the Department of the Interior, an agency and instrumentality of the United States whose

operations and obligations are paid by funds from the United States Treasury.

5.  The original complaint in this matter was filed by relator Harrold E. (Gene) Wright

under the FCA's qui tam provisions, 31 U.S.C. §3730.  On information and belief, Mr. Wright is a

citizen of the United States and a resident of the State of Texas.

6.  Mobil Corporation ("Mobil") is a Delaware corporation that conducts business in this

district.  Mobil, through affiliated entities, is or was in the business of producing and selling gas.

Mobil recently merged with Exxon-Mobil Corporation, formerly known as Exxon Corporation,

and is currently a wholly-owned subsidiary of Exxon-Mobil Corporation.

7.  Mobil Oil Corporation ("Mobil Oil"), Mobil Exploration and Producing U.S., Inc.

("MEPUS"), Mobil Exploration and Producing North America, Inc. ("Mobil NA"), and Mobil

Producing Texas & New Mexico, Inc. ("Mobil Texas") are wholly owned subsidiaries of Mobil.

Mobil Rocky Mountain, Inc. ("Mobil RM") is a wholly owned subsidiary of Mobil Oil. Each of these subsidiaries is or was in the business of producing gas.

8. Mobil Natural Gas, Inc. ("MNGI") is a wholly owned subsidiary of Mobil. Until approximately 1997, MNGI marketed a majority of the natural gas produced by Mobil's producing subsidiaries.

9. Burlington Resources, Inc. ("Burlington") is a Delaware corporation that conducts business in this district. Burlington, through affiliated entities, is or was in the business of producing, transporting, and selling gas.

10. Burlington Resources Oil & Gas Company ("Burlington Oil") is a wholly owned subsidiary of Burlington. Burlington Oil is or was in the business of producing gas. Prior to 1996, Burlington Oil was known as Meridian Oil, Inc.

11. Burlington Resources Trading, Inc. ("Burlington Trading") is a wholly owned subsidiary of Burlington. Burlington Trading is or was in the business of marketing gas produced by Burlington and other producers. Prior to 1996, Burlington Trading was known as Meridian Oil Trading, Inc.

12. Burlington Gathering Resources, Inc. ("Burlington Gathering") is a wholly owned subsidiary of Burlington Oil. Burlington Gathering is or was in the business of gathering and treating natural gas produced by Burlington and other producers in the San Juan basin and elsewhere. Prior to 1996, Burlington Gathering was known as Meridian Oil Gathering, Inc.

## IV. BACKGROUND

### A. Gas Production and Distribution

13.  Natural gas, consisting primarily of methane, is a colorless and odorless hydrocarbon fuel.  Natural gas is produced by drilling into natural gas formations located beneath the Earth's surface.  Some of the largest formations in the United States are located offshore in the Gulf of Mexico and onshore in Texas, Louisiana, New Mexico, Colorado, and Wyoming.

14.  Once a natural gas formation is located, a well is drilled to extract the gas.  Typically, a well is constructed under the terms of a lease between the landowner and a natural gas production company, which authorizes the production company to extract gas from a designated area in exchange for payment to the landowner of a percentage of the production called a royalty.

15.  Depending on the characteristics of a natural gas formation, the extracted gas may contain impurities such as water, hydrogen sulfide, nitrogen and carbon dioxide.  Natural gas extracted from coal seams ("coal seam gas"), for example, contains substantial amounts of water and carbon dioxide.  Typically, impurities must be removed before the natural gas is transported and/or sold.  The removal of these impurities, called treating, may occur either at or away from the lease.

16. Most  natural gas also contains hydrocarbon fuels heavier than methane, such as ethane, propane, butane and pentane.  These heavier fuels are commonly referred to as natural gas liquids ("NGLs") because in isolation they exist in the liquid state at relatively low pressures.  NGLs often have higher economic value than methane and, in addition, must be taken out of the gas stream to make methane usable for many commercial applications.  Thus, NGLs are typically removed from the natural gas stream through processing and sold as separate products.

17.  The processing of natural gas to remove NGLs occurs at facilities known as gas plants.  The end products of processing are marketable natural gas or "residue gas" and NGLs or "gas plant products."

18.  Natural gas is transported from the well to a gas plant by small diameter pipelines called gathering lines.  Once the gas has been processed, the end products are transported to their end-users by large diameter pipelines called mainlines.

19.  Mainlines connect regions of supply with market areas and can either be intrastate or interstate.  Interstate mainlines are regulated by the Federal Energy and Regulatory Commission ("FERC"), which reviews and approves tariffs establishing the maximum price that pipelines can charge for their services.  Depending on current supply and other factors relating to their respective systems, the operators of interstate mainlines often charge less than the approved maximum FERC tariff for the transportation of gas on their systems.

20.  Natural gas is sold under contracts of varying durations.  Short-term contracts, also referred to as spot sales, generally involve sales of 30 days or less.  By contrast, long-term contracts may run anywhere from six months to five years or longer.

21.  Several industry newsletters publish monthly surveys of sales by a portion of producers and purchasers at major trading points.  These surveys, called index prices, are typically limited to spot sales contracts.

### B. The Federal Royalty Program

22.  Congress has authorized the Secretary of the Department of the Interior to lease federal and Indian lands for the production of gas and other minerals under various leasing statutes, including the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., the Mineral

Leasing Act, 30 U.S.C. §181 et seq., the Mineral Leasing Act for Acquired Lands, 30 U.S.C.

§ 351 et seq., the Indian Leasing Act for Tribal Lands, 25 U.S.C. § 396a et seq., the Indian

Leasing Act for Allotted Lands, 25 U.S.C. § 396, and the Indian Mineral Development Act, 25

U.S.C. § 2101 et seq.

23.   Under the terms of these leases, and applicable law and regulations, federal and Indian

lessees (collectively "federal lessees") are required to pay royalties to the United States and Indian

tribes on the gas produced from those leases.  Generally, federal lessees are required to pay

royalties equivalent to one-sixth of the value of production for offshore federal lands, one-eighth

of the value of production for onshore federal lands, and up to one-fifth of the value of production

for Indian lands, depending on specific lease terms.

24.   Under the various leasing statutes, the Secretary of the Department of the Interior is

authorized to promulgate regulations governing the value of federal and Indian gas for royalty

computation purposes.  The Secretary has delegated this rulemaking authority to the Department

of the Interior's Minerals Management Service ("MMS"), which has primary responsibility for

setting, collecting, and auditing the payment of royalties to the United States and Indian tribes.

25.   In 1988, the MMS promulgated comprehensive royalty regulations governing the

valuation of natural gas and NGLs produced from federal and Indian lands.  See 30 C.F.R.      §

206.150 et seq (1988).  In 1996, the MMS recodified the regulations pertaining to Indian lands.

See 30 C.F.R. § 206.170 et seq. (1999).  The recodified Indian regulations are similar in all

relevant respects to the 1988 regulations.

26.   Under the 1988 regulations, the method for valuing gas produced by a federal lessee

depends on how the lessee disposes of the gas.  The regulations divide a federal lessee's

-6-

transactions into two types: gas sold pursuant to an arm's-length contract and gas not sold pursuant to an arm's-length contract. An arm's-length contract is defined as "a contract or agreement that has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests regarding that contract." 30 C.F.R. § 206.151.

27. If a lessee sells its gas pursuant to an arm's-length contract, then the value of the production is the "gross proceeds" of the sale. Id. § 206.152(b). Gross proceeds are defined as the "total monies and other consideration accruing to an oil and gas lessee for the disposition of unprocessed gas, residue gas, or gas plant products produced." Id. § 206.151.

28. If a lessee does not sell its gas pursuant to an arm's-length contract, then the value of the production is, at a minimum, the "reasonable value" of the production as determined under specified benchmarks. Id. §§ 206.152, 206.153. These benchmarks differ depending on whether or not the gas has been processed.

29. For unprocessed gas not sold pursuant to an arm's length contract, the lessee must determine the reasonable value of the gas by applying the first applicable of the three benchmarks listed at 30 C.F.R. § 206.152(c). These benchmarks, in order of priority, are: (a) the lessee's non arm's-length gross proceeds, provided that they are "equivalent" to the gross proceeds paid under "comparable arm's-length contracts" for sales of natural gas in the "same field" or "same area;" (b) "other information relevant in valuing like quality gas," including "gross proceeds under arm's-length contracts," "posted prices," "prices received in arm's-length spot sales," and "other reliable public sources of price or market information;" and (c) "a netback method."

30. For processed gas not sold pursuant to an arm's-length contract, the lessee must determine the reasonable value of its production by applying the first applicable of the three

benchmarks listed at 30 C.F.R. § 206.153(c). These benchmarks, in order of priority, are: (a) the lessee's non arm's-length gross proceeds, provided that they are "equivalent" to the gross proceeds accruing under "comparable arm's-length contracts" for sales of residue gas and gas plants products from the "same processing plant" or "nearby plants;" (b) "other information relevant in valuing like quality residue gas and gas plant products," including "gross proceeds under arm's-length contracts," "posted prices," "prices received in arm's-length spot sales," and "other reliable public sources of price or market information;" and (c) "a netback method."

31.  The regulations authorize a lessee to deduct transportation and processing costs in determining the value of its federal lease production. When a lessee executes a contract with a non-affiliated entity for transportation or processing, the lessee may deduct the "reasonable, actual costs" incurred by the lessee for this service. Id. §§ 206.157(a), 206.159(a). When a lessee executes a contract with an affiliated entity, however, the lessee may only deduct as transportation or processing costs the "reasonable, actual costs" incurred by the affiliated entity. Id. §§ 206.157(b), 206.159(b).

32.  The costs of placing natural gas in marketable condition, including the costs of treating the gas to remove impurities, generally are not deductible costs for royalty computation purposes. Id. §§ 206.152(i), 206.153(i).

33.  However the lessee produces, transports and sells its gas, "under no circumstances" shall the value reported for royalty purposes be "less than the gross proceeds accruing to the lessee less applicable allowances." Id. §§ 206.152(h), 206.153(h).

34.  A lessee is required monthly to account to the MMS for the value of its federal gas production by completing and submitting a Form MMS-2014, Report of Sales and Royalty

-8-

("Form 2014"). This form requires the lessee to report on a summary basis the gross value and volume of production, the amount of any transportation and processing deductions, and the corresponding royalties due for each federal and Indian lease.

35. Because the Form 2014 contains only summary data, the information on this form does not reveal how the lessee valued individual sales of gas from any particular lease to arrive at the valuation amount reported on the Form 2014.

36. Under the applicable regulations, a federal lessee is required to maintain, and to make available to the MMS for audit, records supporting the value reported for royalty purposes. Notwithstanding these requirements, the defendants failed to maintain and/or withheld from MMS auditors, and other parties, information that would have demonstrated their failure to pay the proper amount of royalties owing to the United States.

## V. THE MOBIL DEFENDANTS

37. At all times relevant to this action, Mobil was the parent company, either directly or indirectly, of several wholly-owned producing subsidiaries, including Mobil Oil, MEPUS, Mobil NA, Mobil Texas, Mobil RM, and a wholly-owned marketing affiliate, MNGI (collectively "the Mobil defendants").

38. At all times relevant to this action, the Mobil defendants operated as a single business enterprise and conducted their business for the benefit of the overall enterprise.

39. At all times relevant to this action, the Mobil defendants produced gas from federal and Indian leases, including federal leases offshore in the Gulf of Mexico and federal and Indian leases onshore in the continental United States. Some or all of these leases were held in the name of Mobil's producing subsidiaries.

40.  At all times relevant to this action, Mobil's producing subsidiaries transferred most of their natural gas from the foregoing leases to MNGI.  These transfers occurred under long-term, non arm's-length contracts.  MNGI then sold most of this production to third parties.

41.  At all times relevant to this action, the Mobil defendants computed and paid royalties on the non arm's-length price that MNGI paid to Mobil's producing subsidiaries ("the Mobil transfer price").

42.  At all times relevant to this action, the Mobil transfer price undervalued the Mobil defendants' natural gas for royalty computation purposes because it was calculated using prices that were too low and transportation deductions that were too high.

## A. Failure to Use a Proper Benchmark Price

43.  Under the applicable royalty regulations, the Mobil defendants were required to pay royalties on natural gas not sold pursuant to an arm's-length contract on not less than the reasonable value of the production as established under the applicable benchmarks.  30 C.F.R.  §§ 206.152(c), 206.153(c).

44.  Prior to 1991 for offshore and 1993 for onshore natural gas, the Mobil transfer price was based on the price that MNGI received for sales of that production to third parties.

45.  Beginning in 1991 for offshore and 1993 for onshore natural gas, the Mobil defendants changed this pricing methodology and based the Mobil transfer price on adjusted index prices.

46.  To calculate these adjusted index prices, the Mobil defendants used a three step process.  First, the Mobil defendants identified all possible markets for the sale of their natural gas, and selected an index point price corresponding to each market.  Next, the Mobil defendants

-10-

adjusted the selected index point for the cost of transportation. Finally, the Mobil defendants arithmetically averaged all of the adjusted index points to arrive at a composite adjusted index price. No adjustment or weighting was used to reflect the specific gas volumes, if any, sold to the potential markets corresponding to the selected index points.

47. The Mobil defendants calculated a separate composite adjusted index price for each Mobil lease or group of leases. The Mobil defendants used the resulting composite adjusted index price as the Mobil transfer price for each such lease or group of leases.

48. Due to the Mobil defendants' use of adjusted index prices for the Mobil transfer price, beginning in 1991 for offshore production and 1993 for onshore production, the Mobil transfer price was based on prices that were too low and that did not constitute a reasonable value for Mobil's natural gas under any of the applicable benchmarks.

49. The Mobil transfer price did not satisfy the first benchmark because, among other reasons, it was not equivalent to comparable arm's-length contracts in the same field or area.

50. The Mobil transfer price did not satisfy the second benchmark because, among other reasons:

(a) In calculating the adjusted index prices, the Mobil defendants included indexes corresponding to potential markets that MNGI did not actually use for the sale of the Mobil defendants' gas. Thus, the Mobil defendants' gas went to the most profitable markets, but the Mobil transfer price was calculated as if a portion of that gas went to less profitable markets;

(b) Despite the fact that the Mobil defendants routinely sought, received, and reported internally a premium above index for sales of gas under long-term contracts with

-11-

non-affiliated entities, the Mobil defendants failed to include any premium above index in the Mobil transfer price.

51. The Mobil transfer price did not satisfy the third benchmark because, among other reasons, it was less than the value calculated under a netback method.

52. For the foregoing reasons, the Mobil defendants' payment of royalties on the Mobil transfer price violated their obligation to pay royalties on not less than the reasonable value of their production as established under the applicable benchmarks.

53. The Mobil defendants had actual knowledge that the payment of royalties on the Mobil transfer price violated their obligation to pay royalties on not less than the reasonable value of their production as established under the applicable benchmarks. Alternatively, the Mobil defendants acted in reckless disregard or deliberate ignorance of whether the payment of royalties on the Mobil transfer price violated this obligation.

## B. Inflated Transportation Deductions

54. Under the applicable royalty regulations, the Mobil defendants were prohibited from deducting costs for transportation that exceeded the actual costs paid to third parties for these services. 30 C.F.R. § 206.157(a).

55. During the period that the Mobil defendants used adjusted index prices as the basis for the Mobil transfer price, MNGI contracted with third party pipelines to transport most of the Mobil defendants' federal lease production.

56. One component of the Mobil defendants' adjusted index prices was an adjustment for transportation costs. After the Mobil defendants selected the index point prices to be used in their

calculations, they typically adjusted these index prices downward to reflect the purported cost of transportation between the lease and the chosen index point.

57.  Beginning in 1991 for offshore and 1993 for onshore natural gas, the Mobil defendants routinely used transportation adjustments in their adjusted index price calculations that were inflated and exceeded the actual costs that MNGI paid to transport the Mobil defendants' gas.

58.  When the Mobil defendants' adjusted index price calculations included a potential market that was not actually used by MNGI for the sale of gas, the Mobil defendants used the maximum FERC tariff corresponding to the pipeline serving this potential market.  This tariff frequently exceeded MNGI's actual transportation costs.

59.  Even as to those markets actually used by MNGI  for the sale of gas, the Mobil defendants used as the basis for their transportation adjustments amounts that exceeded any discounts that MNGI negotiated with the pipelines serving those markets.

60.  For the foregoing reasons, the Mobil defendants' payment of royalties on the Mobil transfer price violated their obligation under the applicable royalty regulations to restrict transportation deductions to the actual costs paid to third parties.

61.  The Mobil defendants had actual knowledge that the payment of royalties on the Mobil transfer price violated their obligation under the applicable royalty regulations to restrict transportation deductions to the actual costs paid to third parties.  Alternatively, the Mobil defendants acted in reckless disregard or deliberate ignorance of whether the payment of royalties on the Mobil transfer price violated these restrictions.

## C. Use of False Records and Statements

-13-

62.  As a result of the foregoing conduct, the Mobil defendants knowingly made false statements on the Forms 2014 submitted monthly to the MMS concerning the value of natural gas produced from federal and Indian lands and the royalties owing on that production.

63.  The Mobil defendants concealed their failure to pay the proper amount of royalties by withholding from MMS auditors, and other MMS officials, information concerning their arm's-length sales and purchases, deductions for transportation, processing and other expenses, the formula used to calculate the Mobil transfer price, and other data relevant to the determination of the proper royalty value.  Moreover, some of the information disclosed by the Mobil defendants omitted material information or was otherwise misleading.

64.  Facts material to this cause of action were not known and could not reasonably have been known by an official of the United States with responsibility to act in the circumstances until at least January 1998.

## VI. THE BURLINGTON DEFENDANTS

65.  At all times relevant to this action, Burlington was the parent corporation, either directly or indirectly, of Burlington Oil, Burlington Trading, and Burlington Gathering, which were wholly owned companies engaged, respectively, in the production, marketing, and gathering of natural gas and/or NGLs (collectively "the Burlington defendants").

66.  In addition to Burlington Oil, during part or all of the time relevant to this action, Burlington was the parent, either directly or indirectly, of several other wholly-owned producing subsidiaries, including El Paso Production Company, Southland Royalty Company, and Meridian Oil Production, Inc.

67. During part of the time relevant to this action, until approximately 1992, Burlington was the parent, either directly or indirectly, of El Paso Natural Gas ("EPNG"), a pipeline company that transported natural gas produced by the Burlington defendants and other producers in the San Juan basin and elsewhere. EPNG continued until at least 1995, however, to transport, treat, and process gas produced by the Burlington defendants under non arm's-length contracts negotiated prior to EPNG's separation from Burlington.

68. At all times relevant to this action, the Burlington defendants, and other Burlington subsidiaries, operated as a single business enterprise and conducted their business for the benefit of the overall enterprise.

69. At all times relevant to this action, the Burlington defendants produced gas from federal and Indian leases, including federal leases offshore in the Gulf of Mexico and federal and Indian leases onshore in the San Juan, Permian and Anadarko basins in the continental United States. Some or all of these leases were held in the name of Burlington's producing subsidiaries.

70. At all times relevant to this action, Burlington's producing subsidiaries transferred virtually all of the natural gas and NGLs produced under the foregoing leases to Burlington Trading under non arm's-length contracts. Burlington Trading then sold the natural gas to third parties and transferred the NGLs to other Burlington subsidiaries. These subsidiaries then sold the NGLs to third parties.

71. At all times relevant to this action, Burlington Trading paid to Burlington's producing subsidiaries a composite price for both the natural gas and NGLs transferred to Burlington Trading. The Burlington defendants paid royalties on this non arm's-length price ("the Burlington transfer price").

72. At all times relevant to this proceeding, the Burlington transfer price undervalued the Burlington defendants' natural gas and NGLs for royalty computation purposes because it was calculated using prices that were too low and deductions for transportation, processing, and treating that were either unallowable or excessive.

## A. Failure to Pay on the Proper Price

73. Under the applicable royalty regulations, the Burlington defendants were required to pay royalties on the gross proceeds accruing to the lessee for gas sold pursuant to an arm's-length contract. 30 C.F.R. §§ 206.152(b), 206.153(b).

74. Between at least 1988 and 1998, Burlington used sham intermediate transactions to avoid paying royalties on the full sales price received from third parties under arm's-length contracts. Rather than sell directly to third parties, Burlington's producing subsidiaries first sold the gas to Burlington Trading at the Burlington transfer price. Burlington Trading then sold the gas to third parties at prices above the Burlington transfer price.

75. These sham intermediate transactions between Burlington Trading and Burlington's producing subsidiaries constituted an abuse of the corporate form. Burlington Trading was dominated and controlled by Burlington and its producing subsidiaries. Alternatively, Burlington Trading was a mere instrumentality and/or an alter ego of Burlington and its producing subsidiaries. Accordingly, Burlington Trading's separate corporate existence, and the sham transactions involving Burlington Trading, should be disregarded for royalty purposes.

76. For the foregoing reasons, the Burlington defendants were obligated to pay royalties on the third party sales prices received by Burlington Trading rather than on the lower Burlington transfer price.

77. The Burlington defendants had actual knowledge that they were obligated to pay royalties on the third party sales prices received by Burlington Trading rather than on the lower Burlington Transfer price. Alternatively, the Burlington defendants acted in reckless disregard or deliberate ignorance of whether they were obligated to pay royalties on the third party sales prices received by Burlington Trading rather than on the lower Burlington transfer price.

78. Alternatively, if the Burlington defendants were not obligated to pay on the arm's-length sales prices received by Burlington Trading, then the Burlington transfer price violated Burlington's royalty obligations for determining value under gas not sold pursuant to an arm's-length contract.

79. Under the applicable royalty regulations, the Burlington defendants were required to pay royalties on natural gas not sold pursuant to an arm's-length contract on not less than the reasonable value of the production as established under the applicable benchmarks. 30 C.F.R. §§ 206.152(c), 206.153(c).

80. Between at least 1989 and 1996, the Burlington transfer price did not constitute reasonable value under any of the applicable benchmarks.

81. The Burlington transfer price did not satisfy the first benchmark because, among other reasons, it was not equivalent to comparable arm's-length contracts in the same field or area.

82. The Burlington transfer price did not satisfy the second benchmark because, among other reasons:

(a) The Burlington transfer price was routinely based on estimated rather than actual index prices;

(b) For certain production, the Burlington transfer price was based on index prices that were biased downward by the Burlington defendants' refusal to provide information, or provision of false information, to the survey companies regarding the Burlington defendants' sales of natural gas;

(c) The Burlington transfer price for natural gas from the San Juan basin was based on an index price that did not reflect the Burlington defendants' actual disposition of that gas. Pipelines serving the San Juan basin generally are physically able to transport gas only to the West Coast. Burlington exchanged its gas in the San Juan basin for gas being transported by EPNG in West Texas. Nevertheless, the Burlington transfer price was based on a San Juan index price, which predominantly reflects the lower prices prevailing on the West Coast, rather than on a West Texas index price, which more accurately reflects the higher prices prevailing on the Gulf Coast.

83. The Burlington transfer price did not satisfy the third benchmark because, among other reasons, it was less than the value calculated under a netback method.

84. For the foregoing reasons, the Burlington defendants' payment of royalties on the Burlington transfer price violated their obligation to pay royalties on not less than the reasonable value of the production as established under the applicable benchmarks.

85. The Burlington defendants had actual knowledge that the payment of royalties on the Burlington transfer price violated their obligation to pay on not less than the reasonable value of their production as established under the applicable benchmarks. Alternatively, the Burlington defendants acted in reckless disregard or deliberate ignorance of whether the payment of royalties on the Burlington transfer price violated this obligation.

## C. <u>Failure to Use Actual Costs for Affiliated Transportation and Processing</u>

86. Under the applicable royalty regulations, the Burlington defendants were prohibited from deducting costs for transportation and/or processing services provided by an affiliated entity in excess of that entity's actual reasonable costs.

87. The Burlington transfer price included deductions for the costs of affiliated transportation and/or processing that exceeded the actual reasonable costs of these services.

88. Between 1988 and 1998, Burlington Gathering transported coal seam gas produced by the Burlington defendants in the San Juan basin to the Val Verde treatment plant. Despite the fact that Burlington Gathering is a wholly-owned Burlington affiliate, the Burlington transfer price included deductions for these transportation services that exceeded the actual cost of the services to Burlington Gathering.

89. Between at least 1991 and 1995, EPNG transported and processed non-coal seam gas produced by the Burlington defendants from the San Juan basin. During the period that these services were provided, EPNG was either a wholly-owned Burlington affiliate or was providing these services under a contract negotiated while it was a wholly-owned Burlington affiliate. Nevertheless, the Burlington transfer price included deductions that exceeded both the contract price and the actual cost of these services to EPNG.

90. On information and belief, Burlington's transfer price for gas from the Permian and Anadarko basins also included deductions for affiliated transportation and/or processing that exceeded the actual cost of these services to the affiliated entity.

91.  For the foregoing reasons, the Burlington defendants violated the restrictions in the applicable royalty regulations on deducting the costs of affiliated transportation and processing services for royalty purposes.

92.  The Burlington defendants had actual knowledge that they violated the restrictions in the applicable royalty regulations on deducting affiliated transportation and processing costs for royalty purposes.  Alternatively, the Burlington defendants acted in reckless disregard or deliberate ignorance of whether they violated these restrictions.

## D. Inflated Processing Deductions

93.  Under the applicable royalty regulations, the Burlington defendants were entitled to deduct the price paid for processing services provided by a third party to the extent that price reflected the actual reasonable costs of those services.  30 C.F.R. § 206.159(a).

94.  The Burlington transfer price included deductions for processing that exceeded the reasonable actual cost of the processing services received by the Burlington defendants for natural gas processed at the New Blanco plant in New Mexico, which was owned by Conoco and Amoco.

95.  In the mid-1980s, EPNG settled a private dispute with Conoco and Tenneco, Amoco's predecessor in interest, concerning EPNG's obligation to pay overriding royalties to Conoco and Tenneco on various producing properties in the San Juan basin.  Pursuant to the settlement, Conoco and Tenneco agreed to relieve EPNG of its obligation to pay more than $750,000,000 in overriding royalties, based upon a series of conditions designed to compensate Conoco and Tenneco for the value of the foregone royalties.

-20-

96.  As part of the settlement, the parties entered into the Gas Plant Straddle and
Processing Agreement ("the straddle agreement"), dated May 9, 1984, as amended April 5, 1985.
Under that agreement, Conoco and Tenneco were afforded the right to build the New Blanco
plant.  The straddle agreement also obligated EPNG, for a period of 20 years, to deliver gas of a
certain volume and quality (NGL content) to the New Blanco plant for processing and to convey
to Conoco and Tenneco the right to 39% of all NGLs extracted from gas delivered by EPNG for
processing at the New Blanco plant.

97.  Beginning in at least 1988, EPNG received from Burlington Trading, and processed
at the New Blanco plant, natural gas produced by the Burlington defendants from the San Juan
basin.  Pursuant to the terms of the straddle agreement, EPNG paid a processing fee on all such
gas equivalent to 39% of the extracted NGLs.  This processing fee was passed on to Burlington
Trading, which in turn incorporated it into the Burlington transfer price.

98.  Sometime after the straddle agreement was executed, EPNG began falling short on its
obligation to deliver to the New Blanco plant the volume and quality of gas required under the
agreement.  On January 24, 1992, EPNG entered into a settlement agreement ("the settlement
agreement") with Conoco and Amoco to resolve these volume deficiencies.  Under the settlement
agreement, EPNG agreed to pay $18,700,000 to make up for its past deficiencies.  In addition,
EPNG agreed, going forward, that if it failed to deliver gas for processing of the required volume
and quality, that EPNG would make up for that deficiency by allowing Conoco and Amoco to
retain not only 39% of the NGLs actually extracted from the gas, but also 39% of the additional
NGLs that would have been extracted had EPNG supplied the required volume and quality of gas.

-21-

99. Following the execution of the settlement agreement, EPNG continued to fall short of its obligation to provide the required volume and quality of gas at the New Blanco plant. As a consequence, pursuant to the terms of the settlement agreement, EPNG began paying an added fee on Burlington gas processed at the New Blanco plant over and above the 39% fee that EPNG had already been paying on volumes delivered to the plant. This added fee reflected the additional NGLs that Amoco and Conoco would have received had EPNG satisfied the minimum volume and quality provisions of the straddle agreement. This added processing fee, in addition to the underlying 39% fee, was passed on to Burlington Trading, which in turn incorporated it into the Burlington transfer price.

100. The processing fees that EPNG paid pursuant to the 1984 straddle agreement and the 1992 settlement agreement were intended to compensate Amoco and Conoco for settling their overriding royalty dispute with EPNG and included the transfer of consideration to Amoco and Conoco unrelated to the service of processing the Burlington defendants' gas. Thus, by including the full amount of these fees in the Burlington transfer price, the Burlington defendants improperly transferred the burden of resolving a private, unrelated dispute to federal and Indian royalty interests in the form of inflated processing allowances.

101. For the foregoing reasons, the Burlington defendants' payment of royalties on the Burlington transfer price for gas produced in the San Juan basin and processed at the New Blanco plant violated their obligation under the applicable royalty regulations to limit the price paid to a third party for processing services to the actual reasonable costs of those services.

102. The Burlington defendants had actual knowledge that the Burlington transfer price for gas produced in the San Juan basin and processed at the New Blanco plant violated their

-22-

obligation under the applicable royalty regulations to limit the price paid to a third party for processing services to the actual reasonable costs of those services. Alternatively, the Burlington defendants acted in reckless disregard or deliberate ignorance of whether the Burlington transfer price for gas produced from the San Juan basin and processed at the New Blanco plant violated this limitation.

### E. Unauthorized Treating Deductions

103. Under the applicable royalty regulations, the Burlington defendants were not entitled to deduct treating or other costs incurred to place their gas in marketable condition. 30 C.F.R. §§ 206.152(i), 206.153(i).

104. Between 1989 and 1998, coal seam gas produced by the Burlington defendants was treated at the Val Verde plant to remove the carbon dioxide. Burlington Trading improperly included these treating costs in the Burlington transfer price.

105. For the foregoing reasons, the payment of royalties on the Burlington transfer price for coal seam gas from the San Juan basin violated the prohibition in the applicable royalty regulations on the deduction of treating and other costs incurred to place the gas in marketable condition.

106. The Burlington defendants had actual knowledge that the payment of royalties on the Burlington transfer price for coal seam gas from the San Juan basin violated the prohibition in the MMS royalty regulations on the deduction of treating and other costs required to place the gas in marketable condition. Alternatively, the Burlington defendants acted in reckless disregard or deliberate ignorance of whether the payment of royalties on the Burlington transfer price for coal seam gas from the San Juan basin violated this prohibition.

## F. <u>Use of False Records and Statements</u>

107.  As a result of the foregoing conduct, the Burlington defendants knowingly made false statements on Forms 2014 submitted to the MMS concerning the value of gas produced from federal and Indian leases and the royalties owing on that production.

108.  The Burlington defendants concealed their failure to pay the proper amount of royalties by withholding from MMS auditors, and other MMS officials, information concerning their arm's-length sales and purchases, deductions for transportation, processing and other expenses, the formula used to calculate the non arm's-length price between Burlington Trading and Burlington's producing subsidiaries, and other data relevant to the determination of the proper royalty value.  Moreover, some of the information disclosed by the Burlington defendants omitted material information or was otherwise misleading.

109.  Facts material to this cause of action were not known and could not reasonably have been known by an official of the United States with responsibility to act in the circumstances until at least January 1998.

## <u>COUNT I</u>

### <u>False Claims Act, 31 U.S.C. § 3729(a)(7)</u>
(The Mobil Defendants)

110.  The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though set forth in full herein.

111.  By virtue of the foregoing conduct, the Mobil defendants knowingly made or used, or caused to be made or used, false records and statements concerning the value of natural gas, in

order to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(7).

112. By reason of these false records and statements, the Mobil defendants decreased their obligations to pay money to the United States and Indian tribes as royalties for natural gas produced on federal and Indian leases and damaged the United States in an amount to be established at trial.

### COUNT II

#### False Claims Act, 31 U.S.C. § 3729(a)(7)
(The Burlington Defendants)

113. The United States realleges and incorporates by reference paragraphs 1 through 36 and 65 through 109 of this Complaint as though set forth in full herein.

114. By virtue of the foregoing conduct, the Burlington defendants knowingly made or used, or caused to be made or used, false statements concerning the value of natural gas and NGLs, in order to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(7).

115. By reason of these false records and statements, the Burlington defendants decreased their obligations to pay money to the United States and Indian tribes as royalties for natural gas and NGLs produced on federal and Indian leases and damaged the United States in an amount to be established at trial.

### COUNT III

#### FOGRMA, 30 U.S.C. § 1722
(The Mobil Defendants)

116. The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though set forth in full herein.

117. By virtue of the foregoing conduct, the Mobil defendants undervalued their production of natural gas from federal and Indian lands and, as a consequence, failed to pay the proper amount of royalties owed to the United States under the applicable laws and regulations.

118. By reason of these underpayments, the Mobil defendants have damaged the United States in an amount to be established at trial.

## COUNT IV

### FOGRMA, 30 U.S.C. § 1722
(The Burlington Defendants)

119. The United States realleges and incorporates by reference paragraphs 1 through 36 and 65 through 109 of this Complaint as though set forth in full herein.

120. By virtue of the foregoing conduct, the Burlington defendants undervalued their production of natural gas and NGLs from federal and Indian lands and, as a consequence, failed to pay the proper amount of royalties owed to the United States under the applicable laws and regulations.

121. By reason of these underpayments, the Burlington defendants have damaged the United States in an amount to be established at trial.

## COUNT V

### Unjust Enrichment
(The Mobil Defendants)

122. The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though set forth in full herein.

123.  By virtue of the foregoing conduct, the Mobil defendants failed to pay the full amount of royalties owed to the United States for natural gas produced on federal and Indian leases.  The United States is entitled to payment of the remaining royalties owed by the Mobil defendants.

124.  As a result of these underpayments, the Mobil defendants have been unjustly enriched at the expense of the United States, under circumstances dictating that in equity and good conscience the additional money should be paid, in an amount to be determined at trial.

### COUNT VI

Unjust Enrichment
(The Burlington Defendants)

125.    The United States realleges and incorporates by reference paragraphs 1 through 36 and 65 through 109 of this Complaint as though set forth in full herein.

126.  By virtue of the foregoing conduct, the Burlington defendants failed to pay the full amount of royalties owed to the United States for natural gas and NGLs produced on federal and Indian leases.  The United States is entitled to payment of the remaining royalties owed by the Burlington defendants.

127.  As a result of these underpayments, the Burlington defendants have been unjustly enriched at the expense of the United States, under circumstances dictating that in equity and good conscience the additional money should be paid, in an amount to be determined at trial.

### COUNT VII

Disgorgement
(The Mobil Defendants)

128.   The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though set forth in full herein.

129.   By virtue of the foregoing conduct, the Mobil defendants failed to pay the full amount of royalties owed to the United States for natural gas produced on federal and Indian leases. The United States is entitled to payment of the remaining royalties owed by the Mobil defendants.

130.   The Mobil defendants made or used, or caused to be made or used, false records and statements concerning the value of natural gas, in order to conceal, avoid or decrease their obligation to pay additional royalties to the United States.

131.   This Court, ancillary to the authority conferred upon it by Congress under the leasing statutes, FOGRMA, and the FCA, has the equitable power to effectuate Congress' intention under those provisions to prohibit the Mobil defendants from avoiding their royalty obligations by ordering the Mobil defendants to disgorge the additional royalties owed to the United States.

## COUNT VIII

Disgorgement
(The Burlington Defendants)

132.   The United States realleges and incorporates by reference paragraphs 1 through 36 and 65 through 109 of this Complaint as though set forth in full herein.

133.   By virtue of the foregoing conduct, the Burlington defendants failed to pay the full amount of royalties owed to the United States for natural gas and NGLs produced on federal and Indian leases. The United States is entitled to payment of the remaining royalties owed by the Burlington defendants.

-28-

134. The Burlington defendants made or used, or caused to be made or used, false records and statements concerning the value of natural gas and NGLs, in order to conceal, avoid or decrease their obligation to pay additional royalties to the United States.

135. This Court, ancillary to the authority conferred upon it by Congress under the leasing statutes, FOGRMA, and the FCA, has the equitable power to effectuate Congress' intention under those provisions to prohibit the Burlington defendants from avoiding their royalty obligations by ordering the Burlington defendants to disgorge the additional royalties owed to the United States.

### PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against defendants as follows:

**On Count I** (Claim under the False Claims Act), against the Mobil defendants, jointly and severally, for damages, penalties, and fees and costs, as provided by law, and any other relief that this Court deems appropriate.

**On Count II** (Claim under the False Claims Act ), against the Burlington defendants, jointly and severally, for damages, penalties, and fees and costs, as provided by law, and any other relief that this Court deems appropriate.

**On Count III** (Claim under FOGRMA), against the Mobil defendants, jointly and severally, for additional royalties owed to the United States, plus interest, and fees and costs, including the cost of investigation, as provided by law, and any other relief that this Court deems appropriate.

**On <u>Count IV</u>** (Claim under FOGRMA), against the Burlington defendants, jointly and severally, for additional royalties owed to the United States, plus interest, and fees and costs, including the cost of investigation, as provided by law, and any other relief that this Court deems appropriate.

**On <u>Count V</u>** (Claim for Unjust Enrichment), against the Mobil defendants, jointly and severally, for additional royalties owed to the United States, plus interest, and fees and costs, including the cost of investigation, as provided by law, disgorgement, and any other relief that this Court deems appropriate.

**On <u>Count VI</u>** (Claim for Unjust Enrichment), against the Burlington defendants, jointly and severally, for additional royalties owed to the United States, plus interest, and fees and costs, including the cost of investigation, as provided by law, disgorgement, and any other relief that this Court deems appropriate.

**On <u>Count VII</u>** (Claim for Disgorgement), against the Mobil defendants, jointly and severally, for disgorgement of the additional royalties owed to the United States, plus interest, and any other relief that this Court deems appropriate.

**On <u>Count VIII</u>** (Claim for Disgorgement), against the Burlington defendants, jointly and severally, for disgorgement of the additional royalties owed to the United States, plus interest, and any other relief that this Court deems appropriate.

Respectfully submitted,

DAVID W. OGDEN
Acting Assistant Attorney General
Civil Division

MIKE BRADFORD
United States Attorney
Eastern District of Texas


MATT ORWIG
(Texas Bar No. 15325300)
Assistant United States Attorney
660 North Central Expressway, Suite 400
Plano, Texas  75074-6749
Phone: (972) 509-1201; Fax: (972) 509-1209
ATTORNEY IN CHARGE


MICHAEL F. HERTZ
ALAN E. KLEINBURD


_____

MICHAEL D. GRANSTON
(Washington D.C. Bar No. 446258)
ATTORNEY IN CHARGE
SADHNA TRUE
GREGORY PEARSON
SUSAN LYNCH
SARA MCLEAN

Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 307-0407

Dated:

-31-